### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

COMMUNITY MARITIME PARK
ASSOCIATES, INC.,

       Plaintiff,

v.                                 **Case No. 3:11cv60/MCR/CJK**

MARITIME PARK DEVELOPMENT
PARTNERS, LLC,

       Defendant.

_____/

### <u>ORDER</u>

Community Maritime Park Associates, Inc. ("CMPA") filed this lawsuit against Maritime Park Development Partners, LLC. ("MPDP"), alleging fraud in the inducement, negligent misrepresentation, and violation of Florida's competitive bidding statute, Fla. Stat. § 287.055, in relation to a public development contract.  Pending before the court is MPDP's motion to dismiss for failure to state a claim (doc. 37), *see* Fed. R. Civ. P. 12(b)(6), which CMPA opposes (doc. 56).  MPDP was given leave of court to file a reply (doc. 71). Having fully considered the allegations of the complaint and the arguments of the parties, the court concludes that the motion to dismiss is due to be denied for reasons that follow.

**Background**

In the First Amended Complaint (doc. 18), CMPA alleges the following facts, which the court accepts as true and construes in the light most favorable to the plaintiff at this stage of the proceedings.  *See Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).  CMPA is a publicly funded Florida non-profit corporation governed by a Board of Trustees appointed by the Pensacola City Council; its purpose is to develop and manage City-owned property known as the Vince Whibbs, Sr. Community Maritime Park ("Maritime

Park"). CMPA selected a developer for the Maritime Park project pursuant to the statutory competitive process required by Florida law, known as the Consultants' Competitive Negotiations Act ("CCNA"), Fla. Stat. § 287.055. CMPA ultimately awarded the contract to MPDP, which is alleged to be the successor in interest, the business continuation, or the alter ego of Land Capital Group, Inc. ("Land Capital") (a now-defunct Texas corporation).[1] Land Capital's president was Scott Davison and its vice president was Mark White. Davison and White each have the title of vice president of MPDP, and Jeffrey Galt is MPDP's president.

Under the CCNA, CMPA was required to publicly announce a Request for Qualifications ("RFQ") and to competitively evaluate firms providing professional architecture, engineering, landscape architecture, and surveying services for the project. The CCNA requires the evaluation of a firm's experience and qualifications through the RFQ process, from which the most highly qualified firms are chosen for the negotiating process. *See* Fla. Stat. § 287.055(4). During the competitive negotiations process, after the most qualified candidates are identified, a Request for Proposals ("RFP") may be issued, and negotiations must proceed with the most qualified firm. Fla. Stat. § 287.055(5).

Pursuant to this competitive process, CMPA published an RFQ in early 2007, inviting firms to submit their qualifications for evaluation. The RFQ listed certain minimum qualifications, including work on previous projects, successful development of a major mixed-use project, and a team record of satisfying clients and completing projects, among other things. The RFQ stated that the developer selected must possess "the experience, professional qualifications, financial resources, and willingness to enable it to undertake and complete the development" of the park. (Doc. 18-3, at 3.) Also, the RFQ required that all personnel shall be employees of either the firm applying to be the developer or a collaborative partner of the firm, and expressly prohibited making contingency fee payments to any person for successful award of the agreement. Land Capital submitted

---

[1] MPDP is a Florida limited liability company whose members are domiciled in, and citizens of, the state of Texas, and Texas is its principal place of business. Citizenship was established through an amended notice of removal (doc. 25).

an RFQ response.  After reviewing all RFQ responses, four finalists were selected to make oral presentations.  Land Capital was one of the finalists and scored a number one ranking based on its qualifications.  CMPA published the RFP in early 2008, requesting proposals from the four finalists outlining how they intended to perform the development of the park. The RFP did not require the firms to repeat their previously given RFQ responses, but permitted them to be supplemented.  The RFP emphasized the importance of the developer's experience and financial capacity.

In Land Capital's responses to the RFQ and RFP, it made several representations regarding the qualifications of the "Development Team," which it claimed to have assembled to work on the Maritime Park project.  Davison, Land Capital's president and now a vice president of MPDP, represented in the cover letter to the RFQ response that Land Capital "has assembled a peerless group of professionals" with a great deal of experience.  The response listed the qualifications of multiple companies and several individuals as Land Capital's "collaborative partners" in the venture.  Land Capital identified Silver Cloud Partners (now a defunct corporation), its CEO Harold De Blanc, and Halcyon, Ltd., as part of the team and as having performed large development multi-use projects. Land Capital itself was claimed to have more than 90 employees in nine different cities, 42 completed projects with 25 currently under development; projects "in the pipeline" were said to range from $150 million to $500 million.  Communication Arts Design and its CEO Henry Beers were presented as having the role of Placemaking Visionary on the Development Team, with 55 full-time employees and a 34-year track record of more than 30 successful development projects around the world.  Land Capital identified Bruce Cutright as its project manager.[2]  The developer experience for the project was supplemented with 17 relevant projects in which Cutright had been involved, ranging in value up to $1.5 billion.  Land Capital represented that its financial resources included a joint venture relationship with JP Morgan Asset Management, providing up to $2 billion in

---

[2]  The final agreement identified Cutright as a "key man," who was required to spend at least one day a week at the project and could only be replaced by CMPA's written consent.  (Doc. 18-1, at 22.)

venture capital for the Maritime Park, with Frederick Sheppard of JP Morgan listed as a key member of the personnel and his resume was included in the statement of qualifications. Land Capital created a special LLC (MPDP) for purposes of entering into the contract, but Davison represented to CMPA at an oral presentation in June 2008 that Land Capital was the managing partner for MPDP and that Land Capital would "without a doubt" be the lead developer on the project.  Davison represented that in addition to Land Capital's lead role, Brass Real Estate Fund and its affiliate, Magi Real Estate, would act as co-developer and have an equity interest in the project.  Based on these representations, Land Capital won the right to negotiate and enter into a contract with CMPA.  Land Capital assigned its right to a newly created entity, MPDP (created 11 days prior to submission of the RFP response).  MPDP's sole equity member initially was MP-LC Development Partner, LLC ("MP-LC"), allegedly created by Land Capital to be the sole member and equity owner of MPDP; on July 31, 2009, approximately two weeks before the contract was entered, MPDP added another member, an LLC in Texas created with MPDP's name.

　　CMPA alleges that by statute, it was required to negotiate with the highest ranking firm.  CMPA alleges that the Development Team members referenced for purposes of qualifying for the negotiations were not collaborative partners of Land Capital, as represented, and did not become equity members or employees of MPDP; also, CMPA alleges that the financial resources represented were nonexistent.  CMPA alleges the Development Team referenced as existing was never actually assembled and its alleged members were never legally committed to participate in the project, and that Land Capital and MPDP knew these representations were false when made and were made for the purpose of achieving the number one ranking in qualifications, which CMPA relied on, and which, in turn, entitled MPDP (having been assigned the right from Land Capital), to participate in the negotiation process and be awarded the Development Agreement contract.  According to CMPA, Cutright was never an employee or consultant of Land Capital, MPDP or any collaborative partner and has never been project manager for the defendant.  CMPA further asserts that Halcyon, Communications Arts, JP Morgan Assets

Management, and Frederick Sheppard were not aware that their qualifications or credentials had been used by the defendant to win the contract, and that no joint venture existed between Land Capital and JP Morgan.  Despite the fact that financial capacity was a crucial component of the qualifications for the developer, MPDP's equity members, MP-LC and the Texas MPDP had no significant assets, no relevant project history, and no employees.  According to CMPA's allegations, Land Capital and Davison also failed to disclose material information, such as that Land Capital had been evicted from its corporate offices and was operating with a skeleton crew at the time of a July 2008 presentation to CMPA, that it had defaulted on construction projects and been involved in lawsuits, and that it had terminated substantially all of its employees and closed all nine offices.  CMPA also alleges that Land Capital conveyed to MPDP its right to negotiate for the Maritime Park contract for no consideration to avoid judgment creditors of Land Capital, and that as such, the final contract is subject to being set aside because of fraud.  According to CMPA, the defendant's fraudulent inducement through misrepresented qualifications and financial capacity placed the Maritime Park project in financial risk from the inception of the Development Agreement.

In Count One of the First Amended Complaint, CMPA seeks rescission of the contract based on fraud in the inducement, and CMPA requests that MPDP be required to refund all amounts CMPA paid the defendant, less the fair market value of improvements made prior to the contract being rescinded.  In Count Two, CMPA alternatively seeks rescission on grounds of negligent misrepresentation.  In Count Three, CMPA alternatively seeks rescission based on a violation of Florida's competitive award statutes on grounds that MPDP offered a commission or reward payment in the amount of $60,000 to a third party, Saxet Realty, Inc., as a result of the contract being awarded to MPDP, contrary to the statute.  *See* Fla. Stat. § 287.055(6).

**Discussion**

MPDP moves to dismiss the complaint for failure to state a claim, asserting that the misrepresentations alleged are insufficient to satisfy the elements of fraud and negligent

misrepresentation.  MPDP also argues that the statutory count must be dismissed because the statute referenced does not apply to a contingency fee agreement with a real estate brokerage firm.  CMPA argues that the pleading is sufficient to state a claim on all three counts.  Applying the legal standards set forth below, the court agrees with CMPA.

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief;" detailed allegations are not required.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure seeks dismissal of the complaint for failure to state a claim on which relief can be granted.  In considering a Rule 12(b)(6) motion, the court accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff.  *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).  "[T]he court limits its consideration to the pleadings and exhibits attached thereto" and incorporated into the complaint by reference.  *Thaeter v. Palm Beach County Sheriff's Office*, 449 F.3d 1342, 1352 n.7 (11th Cir. 2006) (internal marks omitted).  The motion is properly denied if the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949  (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  This "plausibility standard" requires a showing of "more than a sheer possibility" that the defendant is liable on the claim.  *Id.*  The allegations of the complaint must set forth enough facts "to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  In other words, the complaint must contain sufficient factual matter, accepted as true, to permit a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.  However, the court need not credit "[t]hreadbare recitals" of the legal elements of a claim unsupported by plausible factual allegations because "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id.*  Moreover, when pleading fraud, the Federal Rules of Civil Procedure require the pleader to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

To state a claim for fraud in the inducement under Florida law, the plaintiff must allege facts from which a fact finder could plausibly find:

> (1) a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment.

*Rose v. ADT Sec. Servs., Inc.*, 989 So. 2d 1244, 1247 (Fla. 1st DCA 2008).  *Cf. Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (noting justifiable reliance is not a necessary element of fraudulent misrepresentation; one may rely on a statement without investigating its truth unless its falsity is obvious to him).   While the economic loss rule ordinarily prevents a party from recovering in tort on a breach of contract claim, where the tort is based on acts that are independent of the contract, such as a claim of fraud in the inducement, the independent tort action survives despite the existence of a breach of contract action.  *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996) (noting that "suit on a contract and suit for fraud in inducing the contract are two different causes of action with separate and consistent remedies" (internal marks omitted)). That is, "[w]hen fraud occurs in connection with misrepresentations, statements, or omissions which cause the complaining party to enter into a transaction," the claim survives as the independent tort of fraud in the inducement.  *Ladner v. AmSouth Bank*, 32 So. 3d 99, 105 (Fla. 2d DCA 2009) (internal marks omitted).

The court finds that the First Amended Complaint adequately alleges, with a plausible recitation of particular facts, that MPDP, its officers, and its alter ego or predecessor in business made knowing misrepresentations intended to induce reliance and that did induce reliance, resulting in damage to the plaintiff.  CMPA alleges that during the competitive qualifications portion of the contract negotiation process required by law, Land Capital and its officers, who later became officers of MPDP which was created for purposes of negotiating the contract – a right won by Land Capital – represented that members of a Development Team had been assembled, the qualifications of these team members were put forward for purposes of demonstrating Land Capital's qualifications,

knowing that the team had not yet been assembled and the members whose qualifications were being advanced had not yet legally associated with the defendant for purposes of this project.  Some organizations and individuals represented to be team members were not even aware that Land Capital and MPDP were using their credentials to enable it to qualify for this contract.  According to the First Amended Complaint, the representations allegedly induced the plaintiff to place Land Capital in the number one ranked spot, entitling it to negotiate the contract though it was not in fact the best qualified firm, as required by statute.

MPDP argues that the claims fail because the misrepresentations were not material to the final agreement, and CMPA's assertion otherwise conflicts with the documents attached to the complaint.  According to MPDP, CMPA altered the negotiating process by stating in the RFP that the draft development agreement would serve as the basis for negotiating the final agreement, and therefore, the final negotiation stage neutralized or erased the materiality of any representations made in the earlier RFQ and RFP stages. The court disagrees.  In the First Amended Complaint, CMPA alleges that because the statute and RFQ required the competitive process that was followed, it was justified in relying on Land Capital's responses to choose the most qualified firm with which to negotiate and that those statements (regarding the qualifications, experience, and financial capacity of the firm) served not only as the foundational basis for the negotiations but also as an assurance that the firm chosen would have both the experience and the financial capability to carry the project through to completion.  CMPA's allegations of materiality and reliance do not conflict with the exhibits, that is, the RFQ and RFP, because they emphasize the importance of these issues.  The fact that CMPA agreed to continue working toward a final agreement does not mean that CMPA no longer relied on the alleged earlier representations.  It is clear from the statutory scheme, the published RFQ and RFP attached to the complaint, and the allegations of the First Amended Complaint, that the issues of qualifications and financial capacity of the applicant continued to be of

utmost importance to CMPA.[3]  The court finds no merit to MPDP's argument otherwise. Similarly lacking in merit is defendant's assertion that there is no identity between MPDP and Land Capital in the allegations of the First Amended Complaint.

MPDP also argues that the merger clause of the Development Agreement, section 18.08, which provides that the agreement contains the complete agreement of the parties and controls over all prior agreements or statements, plainly contradicts the allegations that CMPA actually relied on the earlier representations.  MPDP argues that "a party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract."  *Hillcrest Pac. Corp. v. Yamamura*, 727 So. 2d 1053, 1056 (Fla. 4th DCA 1999).  Under Florida law, however, the mere presence of a merger clause is not "an impediment to a cause of action for fraud in the inducement." *Noack v. Blue Cross and Blue Shield of Fla., Inc.*, 742 So. 2d 433, 434 (Fla. 1st DCA 1999).  Here, CMPA's allegations of fraud do not relate to a representation that merged into an express term of the Development Agreement but instead to the very foundation upon which the ability to negotiate rested.  Again, according to the statutory process and the allegations of the First Amended Complaint, without a determination by CMPA that the defendant's qualifications and available finances for the project ranked above the others, the defendant would not have had the privilege of engaging in the substantive negotiations at all.  This two-stage negotiation process was referenced in the final agreement, which acknowledged that this was the process by which CMPA selected the developer.  MPDP and Land Capital were on notice that their qualifications and experience were crucial to CMPA's determination of which firm to select for the negotiations.   Although the qualifications and financial capacity of the firm selected to engage in the negotiation process were considered separately from the contract negotiations stage, the allegations of the First Amended Complaint indicate that they were nonetheless integral to CMPA's

---

[3]  MPDP's argument that CMPA was not bound by the statutory methodology because it is not a municipality or a state agency is foreclosed at this stage of the proceeding, where the court accepts as true CMPA's allegation that it is governed by a Board of Trustees appointed by the Pensacola City Council and is an instrumentality of the City of Pensacola, which is a municipality under Florida law.

ability to fairly negotiate.  Because CMPA's alleged reliance on fraudulent representations made in the RFQ and RFP responses does not clearly contradict "a specific and unambiguous provision in a written contract," *Wilson v. Equitable Life Assur. Soc. of U.S.*, 622 So. 2d 25, 28 (Fla. 2d DCA 1993), and the misrepresentations were not specifically expressed or dealt with in the contract, the contract's merger language does not preclude a claim of fraudulent inducement in this case, as MPDP contends.  *Cf. Englezios v. Batmasian,* 593 So. 2d 1077, 1078 (Fla. 4th DCA 1992) ("A party may not recover in fraud for an alleged oral misrepresentation which is adequately dealt with in a later written contract.").

MPDP also argues that the damages element is not adequately stated because the asserted damages simply duplicate contract damages and relate to the performance of the contract itself, and therefore do not support a claim of fraud.  CMPA argues that the economic loss rule, which requires damages attributable to fraud to be separate from damages for breach of contract, does not apply where the fraud was inducement for the contract; that is, because the cause of action is distinct from the breach of contract, it is of no consequence whether there is an overlap in damages, citing *La Pesca Grande Charters, Inc. v. Moran*, 704 So. 2d 710, 712 (Fla. 5th DCA 1998) ("The fact that the measure of damages may be the same for both causes of action does not make the fraud claim disappear.").  The damages alleged in the First Amended Complaint include that MPDP was incapable of performing some aspects of the agreement as a result of its lack of qualifications and lack of financial resources, which were necessary to obtain a bond, and also, that CMPA was harmed by granting a valuable public works contract, required by law to go to the most qualified firm, to a company that was unqualified.  As the Supreme Court of Florida has explained, "[t]he economic loss rule has not eliminated causes of action based upon torts independent of the contractual breach even though there exists a breach of contract action.  Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from acts that breached the contract." *HTP, Ltd.*, 685 So. 2d at 1239.  "The key is to determine the independence of

the fraud claim, not to analyze damages." *La Pesca Grande Charters*, 704 So. 2d at 712 (citing *Dantzler Lumber & Export Co. v. Bullington Lumber Co.*, 968 F. Supp. 1543 (M.D.Fla.1997) (reviewing Florida law)).  The court finds the allegations of damage here are proper because the fraudulent acts alleged are independent from a breach of contract claim; therefore the economic loss rule does not bar the claim.  *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74, 76 (Fla. 3d DCA 1997) (noting fraudulent inducement is a tort independent of any contractual duty, and thus it is not barred by the economic loss rule).  "[F]raud in the inducement presents  a special situation where parties to a contract appear to negotiate freely - which normally would constitute grounds for invoking the economic loss doctrine - but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior." *Allen v. Stephan Co.*, 784 So. 2d 456, 458 (Fla. 4th DCA 2000) (internal marks omitted). The acts causing the damage alleged were independent of contract performance; the integrity of the public statutorily required two-stage competitive process was allegedly compromised by the misrepresentations, and this is sufficiently separate from the contract performance to support a tort claim.  *See Pinellas Suncoast Transit Authority v. Mincom, Inc.*, 8:06cv2042, 2007 WL 2225812, at *4-5 (M.D. Fla. 2007).

MPDP contends that because nearly 27 months elapsed between the first alleged misrepresentations and the damage, proximate cause is lacking.  However, according to the allegations, the misrepresentations so infected the selection process as to cause the plaintiff to negotiate with the wrong party – an unqualified party.  The length of that negotiating process therefore is not a factor that affects proximate cause.  While circumstances undoubtedly are subject to change over an extenuated length of time, as MPDP asserts, "Florida law recognizes that fraud can occur by omission and places a duty on one who undertakes to disclose material information to disclose that information fully." *ZC Ins. Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. 4th DCA 2003).  MPDP suggests the allegations and RFQ show no duty to disclose, but this is contradicted by the circumstances alleged and discussed above, which emphasize the importance of the

bidder disclosing its relevant qualifications, experience, and finances.  MPDP's assertion that the published RFQ imposed no ongoing duty to disclose regarding these material facts lacks merit at this stage where the allegations of the complaint are taken as true, and there is no apparent irreconcilable inconsistency to the contrary between the allegations of the First Amended Complaint and the written documents attached to it.

The claim of negligent misrepresentation alleged in Count Two requires the plaintiff to show that a party transmitted false information but at the time was not aware of the falsehood.  *See Butler*, 44 So. 3d at 105.  Justifiable reliance is required for a negligent misrepresentation claim.  *Id.*  To satisfy this element, a recipient of information is responsible for investigating information that a reasonable person in that position would be expected to investigate; otherwise, reliance may not be justified.  *Id.* (stating "a recipient of an erroneous representation cannot hide behind the unintentional negligence of the misrepresenter when the recipient is likewise negligent in failing to discover the error" (internal marks omitted)).  The court finds that the allegations sufficiently to state a claim that misrepresentations were made and CMPA's alleged reliance was justified.  The published RFQ and RFP plainly indicated the importance of the applicants' qualifications, experience, and financial capability to be selected to negotiate with CMPA through the first stage and also to bring the project to completion.  Having published this criteria, CMPA was justified in relying on the responses submitted.

Count Three alleges, as another basis for rescission, the violation of Florida's competitive bidding statute.  *See* Fla. Stat. § 287.055.  Section 287.055(6) expressly provides that a person or entity who obtains a contract to provide "professional services," such as professional engineering, architectural, or surveying services, through the competitive bidding process, is prohibited from offering to a third party non-employee a payment, gift, or commission contingent on or resulting from the award of the contract. The First Amended Complaint asserts that the RFQ expressly called for responding development firms to anticipate providing the type of professional services referenced in § 287.055 and required any members of a Development Team providing those services

to be duly licensed; also, the RFQ required personnel to be either employees of the development firm or a collaborative partner.  MPDP argues that the statutory claim should be dismissed because the statute does not apply to a contingency fee with a real estate brokerage firm, as allegedly paid here, citing *Rotemi Realty, Inc. v. Act Realty Co.*, 911 So. 2d 1181, 1187 (Fla. 2005) (holding "section 287.055 applies only to the specific contracts it mentions," and a real estate brokerage contract is not within its coverage).  MPDP also asserts that the agreement is a "design-build" contract, exempt from § 287.055(6).

First, the court finds the case of *Rotemi Realty*, cited by MPDP, to be inapplicable. The question there was whether a contingency fee paid by a government in a real estate brokerage contract (through which a school district had purchased real property) was contrary to public policy.  The court held, in part, that this brokerage agreement did not conflict with the public policy announced in Fla. Stat. § 287.055, because the legislature limited the scope of that statute, which prohibits contingency fees for the award of a public contract in certain instances, to the specific contracts mentioned therein; the statute does not mention real estate brokerage contracts.  *Rotemi Realty*, 911 So. 2d at 1187.  Here, the RFQ seeking bids from development firms explicitly indicated that the services anticipated of the developer would include the type of professional services that are within the scope of the statute, namely, architecture, engineering, site planning, and landscape architecture, and that any architects, engineers or landscape architects must be registered as required by Florida law.  (Doc. 18-3, at 3-4.)  Moreover, the RFQ explicitly provided, "By responding to this solicitation, each applicant warrants that it and will not employ or retain any company or person, other than a bona fide employee working solely for the firm, to solicit or secure an agreement pursuant to this solicitation and that it has not and will not pay or agree to pay any person . . . any fee, commission, percentage, gift, or other consideration contingent upon or resulting from the award or making of an agreement." (Doc. 18-3, at 5.)  Section 287.055 requires this express prohibition to be included in any agreement entered into by a public agency for the professional services listed in the statute and provides that upon a violation of this provision, "the agency shall have the right to

terminate the agreement." Fla. Stat. § 287.055(6)(a). CMPA sufficiently alleges that MPDP paid a contingency fee to another firm as a reward for securing the developer agreement and that the RFQ and agreement contemplate that the developer would provide the type of professional services mentioned in the statute. Contrary to MPDP's argument, it is of no consequence that the prohibited contingency fee was allegedly paid to a brokerage firm.

Second, MPDP alleges that Count Three fails to state a claim because the developer agreement is a design-build contract, exempt from the statutory prohibition on contingency fees. This argument also fails. Although, as MPDP contends, § 287.055(9) provides that, "[e]xcept as provided in this subsection, this section is not applicable to the procurement of design-build contracts by any agency," in this case, the agreement at issue is a development agreement contemplating the provision of professional services, not a "design-build" contract.[4] The court recognizes that the agreement between MPDP and CMPA states that the developer (MPDP) may act as the design-build contractor if CMPA agrees it is in the City's best interest for it to do so; however, at the same time, the court notes that the agreement also provides that, if this occurs, a design-build contract would be negotiated, plainly implying such a contract did not yet exist. (*See* Doc. 18-1, at 24 (stating, "certain efficiencies and cost-savings may be realized by the Developer acting as the Design-Build Contractor on the Site Preparation Project or the Public Improvements or both," but any "decision by CMPA to engage the Developer as the Design-Build Contractor shall be subject to negotiation of a design-build contract.").) In addition, an express provision in the agreement represents that it was procured in accordance with Fla. Stat. § 287.055, and another provision prohibits a broker commission, consistent with the

---

[4] Subsection (9) further provides that if an agency enters into a professional services contract for a "design criteria package," then the competitive bidding statute applies. Fla. Stat. § 287.055(9). MPDP seems to argue that the agreement at issue is a design-build contract because there were references in the RFQ and RFP to an anticipated design criteria package. The court sees no relevance to this in determining the character of the contract at hand; the design criteria package referenced is not the subject of the agreement at issue.

statute.[5]   As noted above, the RFQ similarly included an express contingency fee prohibition and anticipated the provision of professional services within the scope of the statute.   The court finds that the allegations of Count Three – i.e., that the defendant offered a contingency fee to a brokerage company as a reward for the public contract being awarded to the defendant – are sufficient to state a claim under § 287.055(6).

Accordingly, it is hereby ORDERED that MPDP's Motion to Dismiss (doc. 37) is DENIED.

**DONE and ORDERED** this 14th day of July, 2011.


s/ *M. Casey Rodgers*
**M. CASEY RODGERS**
**CHIEF  UNITED  STATES  DISTRICT  JUDGE**

---

[5]   Further, the agreement defines "Project Professionals" as meaning architects and engineers, among others, "retained or employed by the Developer."  (Doc. 18-1, at 10.)  Those professional services, as noted above, are within the scope of the statute.