**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**COMMUNITY MARITIME PARK**
**ASSOCIATES, INC.,**

       **Plaintiff,**

**v.**                                **Case No. 3:11cv60/MCR/CJK**

**MARITIME PARK DEVELOPMENT**
**PARTNERS, LLC,**

       **Defendant.**

_____/

## ORDER

The Court has previously determined that the public works contract at issue in this case, which Plaintiff awarded Defendant in August 2009, is void for material noncompliance with Florida's competitive negotiations statute, known as the Competitive Consultants Negotiations Act ("CCNA"), Fla. Stat. § 287.055 and that disgorgement is the proper remedy.[1]  In light of Defendant's affirmative defense of equitable setoff and to resolve issues of fact regarding whether fraud occurred in the CCNA process, the Court held a final evidentiary hearing on January 30, 2013, through February 5, 2013.  This order sets forth the Court's findings of fact and conclusions of law on these remaining issues.

**Procedural Background**

In 2011, Plaintiff Community Maritime Park Associates, Inc. ("CMPA") brought suit in state court seeking rescission and cancellation of a public works development contract ("Development Agreement") it entered into with Defendant Maritime Park Development Partners, LLC. ("MPDP"), alleging fraud, misrepresentation, and rescission on public policy grounds for the violation of Florida's competitive award statutes.  MPDP removed the case

---

[1] No other public bidding process was engaged in pursuant to Florida law.  *See* Fla. Stat. § 255.20.

to federal court. CMPA later moved for summary judgment on Count III of its complaint for violation of the CCNA, which the Court granted partially, declaring the professional services portion of the Development Agreement void. (Doc. 207). On reconsideration, the Court determined that the *entire* Development Agreement was void for violation of the CCNA and because no other Florida competitive award or bidding statute was engaged in, which in turn required disgorgement of all public monies paid on the void contract in an amount yet to be determined. (Doc. 252). The parties have stipulated to the undisputed facts set forth in the prior orders,[2] and the Court incorporates those facts herein by reference, without reciting them again in full (doc. 306, at 28, ¶1). The following summary of the operative undisputed background facts from those orders, however, will be helpful to an understanding of the remaining issues.

CMPA is a publicly funded non-profit corporation governed by a Board appointed by the City of Pensacola, Florida, tasked with developing and managing city-owned property known as the Vince Whibbs, Sr. Community Maritime Park, a project originally estimated to exceed $38 million in construction costs. In seeking a Master Developer for the project, CMPA was required by the CCNA to competitively award the contract to the most highly qualified firm.[3] Accordingly, in early 2007, CMPA proceeded to engage in a two-stage competitive negotiations process under the CCNA, first selecting the most qualified firm and then engaging with that firm in contract negotiations. To solicit qualified professional services firms to compete for the project, CMPA issued a formal Request for Qualifications (RFQ). Among the requirements listed in the RFQ, candidates for Master Developer had to demonstrate the following regarding their businesses: (1) previously completed projects of at least $50 million; (2) successful development of at least one major

---

[2] The parties also stipulate to the facts set forth in the Court's order granting CMPA a preliminary injunction (doc. 227) to preserve the status quo regarding funds owed to MPDP by Magi Construction, LLC, a firm created between MPDP and Hoar Construction Company for purposes of the design-build contract, until the Court determined the final amount to be disgorged.

[3] Pursuant to the CCNA, any firm desiring to participate in the competitive selection process must first be certified by the agency as qualified, that is, "fully qualified to render the required service," based on its capabilities, adequacy of personnel, past record, and experience of the firm. Fla. Stat. § 287.055(3)(c).

mixed-use project; (3) ability to obtain or attract financing for all aspects of the proposed project; (4) a team including qualified professionals registered in the State of Florida, and (5) a team record of long-term management of completed projects, (6) a team record of small and minority business inclusion, and also (7) a record of satisfying clients and end users. All personnel assigned to the project were required to be employees of the Master Developer or a collaborative partner and had to be approved by CMPA. Master Developer candidates were required to identify each organization that would provide services, including company principals. Another crucial requirement of the qualifications process was that the chosen Master Developer be able to demonstrate sufficient financial capacity in order to obtain and attract adequate financing for all aspects of the project. This requirement–to demonstrate financial capacity–garnered the highest point total on CMPA's Master Developer evaluation sheet included in the RFQ. Based on the applicants' RFQ submissions, CMPA selected four qualified firms, with an organization known as Land Capital Group, Inc. ("Land Capital") ranked as the top firm.[4]

CMPA then issued a Request for Proposals (RFP), soliciting proposals only from the four finalists and requesting more details regarding each candidate's vision, concept and implementation plans for development of the park. The RFP did not require the four finalists to restate their RFQ responses and qualifications but did permit supplementation of the prior submissions and emphasized the importance of the applicant's experience and financial capacity. The finalists were also required to submit a transmittal letter identifying the lead proposers and any persons with an equity interest in the project, describing their legal and financial relationships and confirming that any legal entity created for the project was in existence and that the person signing the letter was authorized to act on its behalf. The finalists also participated in oral presentations before CMPA.

Land Capital submitted an RFP response to CMPA on May 30, 2008, and presented an oral presentation on June 13, 2008. Both included representations by Land Capital's

---

[4] The CCNA required the agency to evaluate qualifications of the firms, including professional personnel and past performance, and to "select in order of preference no fewer than three firms deemed to be the most highly qualified." Fla. Stat. § 287.055(4)(a), (b).

CEO Scott Davison that Land Capital had partnered in a joint venture with entities known as Brass Real Estate Fund and Magi Real Estate ("Brass/Magi"), owned by an individual named Richard Rodriguez.  Davison stated in the RFP transmittal letter that Land Capital and Brass/Magi had created a project specific development entity–Defendant MPDP–to enter into the Development Agreement with CMPA, and that Jeffrey Galt, Chief Financial Officer of Brass/Magi, would serve as president of MPDP and Davison as vice-president. Galt and Bruce Cutright, the individual named in Land Capital's RFP as the project manager, both participated in the June 2009 oral presentation with Davison.  Land Capital's RFP response outlined in detail Cutright's impressive project history.  CMPA was impressed by Land Capital's written response and "assembled team" of professionals, as well as its oral presentation, and as a result, Land Capital maintained its top ranking following the RFP process.

As the top-ranked firm, Land Capital earned the right to engage in contract negotiations with CMPA.[5]  The contract negotiations commenced in August or September of 2008 between Galt and Davison for MPDP, and CMPA's representative, Owen Beitsch. Later in the process, Barry Abramson participated as the City's representative, as well as City Attorney Rusty Wells, among others, while Trinity Capital Advisors, the second most qualified firm, waited on standby, in case negotiations with MPDP did not produce an acceptable agreement.

During the course of the negotiations and prior to the execution of the Development Agreement, Land Capital financially collapsed and was unable to play any role in the project.  Although CMPA was not aware of Land Capital's demise, it did become aware in December 2008 that Land Capital was suffering financial difficulties; however, Davison and Galt assured CMPA and the public that its financial partner, Brass/Magi, was sound and therefore Land Capital's financial troubles would not threaten the project.  In late April

---

[5]  Under the CCNA, if negotiations with the most highly qualified firm did not result in a contract, CMPA was required to negotiate with the next most highly qualified firm.  In this case, the second-ranked firm was an entity known as Trinity Capital Advisors.

2009, after an audit confirmed that Brass/Magi was financially sound,[6] CMPA and the City Council approved a final Development Agreement which identified MPDP as Master Developer. The record unquestionably reflects that at that time, CMPA understood, based on the representations of Davison and Galt, that MPDP was a joint venture between Land Capital and Brass/Magi.

The final Development Agreement, which was executed by all parties on August 14, 2009, set forth four separate roles for the Master Developer: (1) to act as Project Coordinator, for which it would be paid a 4% Development Fee; (2) to act as CMPA's agent in managing the facilities, for which it would be paid a management fee; (3) the potential to act as design-build contractor, in CMPA's sole discretion, for an additional 3% fee; and (4) to act as developer of private improvements under a separate sub-lease. The Development Agreement required the Master Developer to be a qualified design-build contractor as of the date of the Agreement was executed, although the design-build contract would be awarded separately, at CMPA's discretion.[7] CMPA ultimately voted in January 2010 to award the design-build contract to MPDP. MPDP, however, proved to be unable to acquire the necessary bonding without the aid of another company, Hoar Construction, with whom MPDP formed a new company, Magi Construction, LLC (not to be confused with Brass/Magi), to be named as the general contractor. As a result of this arrangement, MPDP and Hoar Construction agreed to share the Master Developer's 3% fee for the design-build contract.

After entering into the Development Agreement with MPDP, CMPA became aware of the following: (1) Land Capital had not merely suffered financial difficulties but had actually collapsed during the contract negotiations; (2) neither Land Capital nor MPDP were members of a joint venture with Brass/Magi; and (3) MPDP, which was a project-

---

[6] The audit was performed by Mort O'Sullivan, a certified public accountant.

[7] City Attorney Wells testified that he counseled the City not to execute the contract until Mark White – whom MPDP intended to use as the qualifying contractor for purposes of the design-build contract– was fully licensed as a contractor in Florida. The contract execution date was delayed from April until August 2009 due to delays in White obtaining a Florida contractor's license.

specific corporation with no assets and no professional qualifications of its own, had entered into the Development Agreement as Master Developer without any legal affiliation with Brass/Magi or Land Capital, the firm selected as the most qualified under the CCNA procedures. As a result, CMPA rescinded the contract in January 2011 and filed this law suit.

In its prior orders granting summary judgment, the Court concluded that the Development Agreement had been awarded to a shell entity, i.e., MPDP, and not the firm selected as the most highly qualified through the CCNA competitive qualifications procedure, which was Land Capital. The Court found that this irregularity constituted a material noncompliance with the CCNA. Although in Florida a public body has "wide discretion" to implement competitive award procedures for public improvements and courts will not interfere when the procedures are "based on an honest exercise of this discretion," *Liberty Cnty. v. Baxter's Asphalt & Concrete, Inc.*, 421 So. 2d 505, 507 (Fla. 1982), the Court in this case concluded that CMPA had no discretion under the statute to award the professional services portion of the Development Agreement to an entity that was not affiliated with the firm deemed "most highly qualified" within the meaning of the CCNA and which did not compete at all in the qualifications portion of the award process. Also, because no other competitive award procedures were used, the Court concluded that the entire Development Agreement was void and that disgorgement of money paid under the void public contract was required. Additionally, the Court entered a preliminary injunction, requiring MPDP to deposit with the Court any money it received as profit from the design-build contract, up to the sum of $460,786, in order to preserve the status quo until the amount of disgorgement could be determined.[8]

Although it was not necessary for purposes of summary judgment to determine whether the statutory noncompliance resulted from knowing misrepresentations by MPDP,

---

[8] The Preliminary Injunction Order is currently the subject of an appeal to the Eleventh Circuit Court of Appeals (*see* doc. 235, notice of appeal); however, this Court retains jurisdiction over the complaint. *See State of Ala. v. EPA*, 871 F. 2d 1548, 1553-54 (11th Cir. 1989) (stating, "[t]he district court had jurisdiction to grant summary judgment and to dismiss the suit despite the pending interlocutory appeal" of a preliminary injunction).

as CMPA argued, or from a good faith mistake, as MPDP argued, this factual issue must now be resolved in order for the Court to determine the amount that is due to be repaid to the public treasury by MPDP. As explained in prior orders (*see* docs. 207 & 252), an equitable defense of setoff is only potentially available to MPDP to the extent no fraud or misrepresentation invaded the statutory competitive award process. MPDP insists it should not be required to repay any amounts it received on the void contract, arguing it acted in good faith by providing valuable services under the contract. CMPA argues that all amounts paid on the void public contract must be disgorged because misrepresentations of MPDP's officers corrupted the statutory competitive award process. To resolve these remaining issues of fact and determine the amount of money MPDP must return to CMPA, the Court held an evidentiary hearing. Now, having fully considered the testimony and evidence presented at the hearing, the complete record, the applicable case law, and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

**Findings of Fact**

1.      Through the RFQ issued in February 2007, CMPA sought a "firm" that possessed "the experience, professional qualifications, financial resources, and willingness to enable it to undertake and complete" the project. (Doc. 18-3). The RFQ required, among many things, that all personnel assigned to the project be employees of the Master Developer or a collaborative partner. Also, the requirement to demonstrate financial capacity, which garnered the highest point total on CMPA's Master Developer evaluation sheet included in the RFQ, illustrates the importance of this factor to CMPA in making the award. Land Capital's application named Land Capital and Silver Cloud Partners, Inc., as Master Developers, with Silver Cloud's founder, Harold DeBlanc listed as project manager. Halcyon Ltd., and its president, Michael Buckley, were listed as the team's development strategists, and other team members included various architectural, design, financing, and marketing specialists. Davison, as Land Capital's CEO, represented in his cover letter

accompanying Land Capital's RFQ application that this team of professionals had been "assembled" for the project.

2.      The RFP issued to the four finalists in February 2008 required, among other things, a letter identifying the lead proposers and persons with an equity interest in the project, along with a brief description of the legal and financial relationships of the team. It also required general team information, including the Developer's experience, an outline of the project concept, and anticipated project financing, among other things. The proposal also had to identify the roles of the individual personnel who would work on the project, along with details regarding the project manager's experience, in addition to demonstrating the proposer's financial capacity to carry out the proposed project and honor any obligations and responsibilities negotiated. The RFP stated expressly that information previously provided in the RFQ response regarding the proposer's team did not need to be restated in the RFP response.

Davison represented in Land Capital's RFP proposal letter in May 2008 that Land Capital was the "lead proposer;" that Brass/Magi would have an equity interest in the project; that MPDP would serve as the Developer's "legal entity;" and that MPDP was a "joint venture" between Land Capital and Brass/Magi, "each represented by their own limited liability companies." Land Capital's RFP response omitted reference to Silver Cloud, which previously had been listed in the RFQ response as one of the master developers with Land Capital, and instead identified Land Capital as lead developer with Brass/Magi as co-developers and financiers. Bruce Cutright, identified as a consultant and project manager, was a new team member at the RFP stage along with various architectural, design and civil engineering companies, only three of which had been named as team members in the RFQ. Davison emphasized during the RFP oral presentation on June 13, 2008, that Land Capital was the "managing partner" of the team. Davison also stated during that presentation that MPDP was an equity stakeholder and a "partnership" between Brass/Magi and one of Land Capital's "subsidiaries," but no further detail was provided regarding MPDP's members.

3.      In the interval between Land Capital's RFQ and RFP submissions, Land Capital's financial stability had drastically deteriorated, as both Davison and Galt testified, yet they did not fully disclose this substantial change, or the extent of it, in their RFP written responses or oral presentation on June 13, 2008, but instead represented to CMPA that Land Capital would be the "lead developer" on the project.   Davison particularly emphasized during the oral presentation that "without a doubt" Land Capital would be the "lead developer" for the project, though he knew at the time that Land Capital was financially collapsing.  Davison admitted on cross examination that, while making these representations, he did not expressly disclose that Land Capital was (1) undergoing financial difficulties; (2) operating with only one to four employees instead of the 85 or 90 employees as originally represented to CMPA; or (3) in danger of being evicted from its business offices.[9]  Davison attempted to explain at the hearing that he had been referring to the project team as a whole in representing that Land Capital had 90 or so employees, but this was not the impression given during his RFP presentation to CMPA.  Galt knew of Davison's financial difficulties before joining in and submitting the RFP response; he testified that he became involved in the project at the RFP stage because Davison was looking for new financial backing due to his personal and business financial troubles.[10]

4.      Davison and Galt also failed to fully disclose that Land Capital's team qualifications had substantially changed between the RFQ and RFP stages.  Neither Land Capital's written RFP proposal nor Davison's presentation before CMPA on June 13, 2008, included any express disclosure that RFQ-identified team members, such as Silver Cloud and Halcyon–whose qualifications and employees had helped Land Capital earn the

---

[9]  Within a month of the oral presentation–by July 2008–Land Capital had been evicted from its offices, and Davison admitted that by October 2008, he had closed the last Land Capital office.  Before the Development Agreement was signed, all of Land Capital's staff had been laid off.  Davison said he did inform CMPA during a public meeting in December 2008 that Land Capital's project pipeline had decreased from $500 million to $150 million, but on cross examination, he admitted that the project pipeline projection he provided to CMPA still included projects that he had *hoped* to obtain and develop but for which Land Capital had no contract.

[10]  Rodriguez testified that he was aware of Davison's financial troubles sometime after Land Capital's RFP submission and before the Development Agreement was entered.

number-one ranking at the RFQ stage—were no longer involved with the team or relevant to the project, or that Bruce Cutright, touted in the RFP as the project manager with an impressive project history, was not, and never had been, actually employed by any of the team members. Moreover, in the RFP, Davison linked Land Capital to Brass/Magi for purposes of meeting the financing requirement, representing repeatedly that they were "joint venture partners," but testimony by Galt and Rodriguez demonstrated that no actual joint venture ever existed. It is also significant that Land Capital and Brass/Magi together did not possess the requisite mixed-use project experience without the team members that had been presented to CMPA in the RFQ response and that CMPA did not know those team members were no longer involved.[11]

The record is clear that CMPA understood the firm or team qualifications of the four finalists—as represented in their RFQ presentations—would continue to exist throughout the selection process, as supplemented by additional detail presented in the RFP responses and subject to CMPA's right to approve replacement personnel. The Honorable Lacey Collier, Chairman of CMPA during the qualifications phase and throughout 2010, testified that he understood the RFP to be a continuation of the qualification process with the top-ranked firms, not a chance for participants to start over, and he further testified that Land Capital would have been eliminated from the competitive process had CMPA known at any time before entering the contract that Land Capital no longer met the minimum requirements of the qualifications stage. Ed Spears, Executive Director of CMPA, similarly testified that the minimum qualifications set forth by Land Capital in the RFQ were never

---

[11] The parties do not dispute that the Land Capital team submitted an RFQ response that met the requisite qualifications, including multi-use waterfront projects comparable to the project planned here, but the evidence is clear that the substituted team set forth in the RFP lacked any multi-use waterfront project history. Davison admitted during the hearing that Brass/Magi did not have mixed use waterfront experience as required by the RFQ. Land Capital's original team touted the qualifications of Silver Cloud with its employee project manager DeBlanc, and Halcyon with its employee Buckley, to satisfy the project qualification requirements, including that of mixed-use waterfront developments. As noted above, there is no evidence that CMPA was directly informed that Silver Cloud and Halcyon were no longer part of the team. Richard Rodriguez, the owner of Brass/Magi, testified in his deposition that his companies employed persons licensed in areas of construction, architecture, and accounting, but he admitted that neither his companies nor Land Capital possessed all of the qualifications required for this project.

formally amended or altered during the competitive award process.  Davison testified that
Land Capital's RFQ representations were accurate when they were made but that
circumstances changed before the RFP response was submitted, requiring him to bring in
new team members and a new financial partner and that CMPA simply "presumed
incorrectly" that prior team qualifications were still relevant.  The Court finds that any
incorrect presumption on CMPA's part was the direct result of Davison's omission of
material information regarding both Land Capital's financial troubles and the true nature
of its changing team.

5.     Davison represented his team as already assembled and as "partners,"
although in fact they were not bound together by any formal agreement or legal
arrangement, in spite of the fact that the team and legal relationships were required to
have been formed and in place before the proposals were submitted.  For example,
Davison touted Cutright as a key team member while knowing Land Capital had not
secured him as an employee or by any other formal agreement.  Judge Collier testified that
team members were required to be employees or "partners" in the legal sense.  He said
the CMPA Board had relied heavily on Land Capital's representations of in-house
capability during the qualifications process, envisioning that the team members would have
employee status and Land Capital thus would have in-house capability to manage
professionals, such as architects and engineers, as required by the express terms of the
original RFQ.  Judge Collier also testified that Cutright's impressive project history was
highly influential in CMPA's decision to select Land Capital's team as the most highly
qualified, and he believed Davison had misrepresented Cutright as a team member in 2008
for purposes of qualifying for the project without having secured him through a formal
agreement.[12]  City Attorney Wells testified that he, too, expected there to have been some

---

[12] Also, the RFP required candidates to demonstrate the extent and nature of meaningful involvement
by local and minority contractors.  Judge Collier testified that Davison persuaded many Board members to
vote for Land Capital during the CCNA qualifications process by pledging to donate $250,000 of the
developer's fee to a contractor academy – a minority contractor inclusion and education program.  Judge
Collier testified that the Board later learned Davison had intended this to be only an "in kind" contribution
(Davison considered his participation in meetings and workshops with the minority contractors as his

contractual arrangement between Cutright and the proposer before Land Capital included him in the RFP proposal.  This expectation was based on requirements in the RFQ/RFP process as well as the CCNA, both of which contemplated the selection of "a qualified firm" as defined in the CCNA.

Davison testified that he intended Cutright to be a team member, but it did not work out in the end, and he blamed the failure on the lengthy contract negotiations phase, insisting MPDP could not offer Cutright a contract until the Development Agreement was signed.[13]  During the negotiations, however, Davison continued to lead CMPA to believe Cutright was secured for the project.  This is evidenced by Beitsch's comments during a public meeting on March 13, 2009, when, based on an impression Davison had given him, Beitsch stated Cutright had become a "formal part of the team."  But Davison knew this was not true.  The evidence shows that on October 3, 2008, during the contract negotiations, Skip Greeby, Cutright's employer, sent Davison an email informing him that Cutright might not be available for the project if MPDP did not formalize an agreement with him soon.  Greeby encouraged Davison to finalize an agreement with Cutright soon because Cutright had been represented as "an integral part" of Land Capital's team, and it might otherwise appear as though a "bait and switch" had occurred.  Cutright stated in his deposition that he had been available from September through December 2008 and needed the work but that he was never offered a contract by MPDP.  In the end, he accepted a job with the University of Texas, but he testified at the hearing that he would have been prepared to return and work full time on this project if MPDP had offered him an agreement.  The Development Agreement ultimately identified Cutright as a key figure, who could be replaced only on approval of CMPA and guaranteed he would devote a

---

contribution), which, according to Judge Collier, "really amounts to nothing."  Judge Collier further testified that during the process he became personally skeptical of representations made by Davison, who, according to Judge Collier, always had an answer for any issue that arose and as a result, he had voted against Land Capital during the qualifications procedures.

[13]  If Land Capital or MPDP had been a qualified firm with the financial capacity required, it would have had the capacity to employ key personnel in house, as contemplated by the RFQ and RFP.

minimum of one day per week to the site preparation project and would visit the site twice per month. Even then, MPDP had no formal agreement with Cutright, and by the time the Development Agreement was signed in August 2009, Cutright had taken the job in Texas. It is clear that CMPA's members were led to believe that Cutright was an employee of Land Capital or a listed collaborative partner, when he was not.[14] It is also clear that because of his impressive project history, Cutright's role as project manager was highly influential in CMPA's decision to award the Development Agreement to Land Capital.

Moreover, the evidence showed that nearly Land Capital's entire project team changed between the RFQ and RFP stages, and there was never even an informal agreement between Land Capital and any team member. At most, the testimony of Richard Rodriguez and Cutright suggests that they had "intended" to partner with Davison and Land Capital when first approached to join in the project, but circumstances, of which CMPA plainly was never informed, changed. Unable to present evidence of any binding relationships between the entities of Land Capital, MPDP, and Brass/Magi, Davison and Galt testified that they thought the *individuals* identified in the RFP were "the team" and that therefore, the project entity and legal relationships were not significant. Galt testified that Land Capital's asset was Davison, and Davison agreed, comparing himself to a movie director and testifying that although he works with collaborative partners, it is his knowledge that "makes the thing go." Again, this was clearly not CMPA's understanding. By the plain language of the formal requests for qualifications and proposals, CMPA sought a qualified "firm" with in-house professionals with the requisite expertise, an extensive project history, and the financial wherewithal to complete the project, not simply knowledgeable individuals who were willing to contract out the work. Davison in fact had no "assembled team" or firm possessing all of the necessary qualifications, contrary to his representations to CMPA, because no formal or informal agreements bound his company to any other "team"

---

[14] Although the term "collaborative partner" was not explicitly defined in the RFQ, and Davison testified that he viewed his team members as collaborative partners in a loose sense of the word, this clearly was not CMPA's understanding. In fact, it defies common sense to suggest on this record that anything other than a legally secure partnership was intended. In any event, it is undisputed that Cutright was not employed by Land Capital, and his employer, Greeby, was not listed in the RFP as a partner or team member.

members or licensed professionals.  Davison himself admittedly had no contractor's license, no engineering or architecture license, no accountant, landscaping or real estate brokers license, and no project history as required of the winning "firm" under the plain terms of the CCNA and the RFQ, and neither did Galt or MPDP.

6.      Beginning with Land Capital's May 2008 letter accompanying the RFP, Davison linked Land Capital to Brass/Magi for purposes of meeting the financing requirement by representing repeatedly that they were "joint venture partners," each represented by its own limited liability company.  However, the testimony of Galt and Rodriguez demonstrates that no actual joint venture ever existed.  Davison also falsely represented during the June 13, 2008, oral RFP presentation that Land Capital was the "managing partner" of MPDP.  The evidence shows that when these representations were made, MPDP's sole equity member was MP-LC Development Partner, LLC ("MP-LC"), a shell corporation that Davison testified he created for the special purpose of being a member of MPDP.  MP-LC had no assets or professional employees, and there was no evidence that it was ever connected to or controlled by Land Capital or Brass/Magi.[15] Rodriguez created a Texas LLC, Maritime Park Development Partners, LLC ("the Texas LLC"), which joined MPDP on July 31, 2009, over a year after Davison represented to CMPA that MPDP was a joint venture between Land Capital and Brass/Magi through their limited liability companies.[16]  Rodriguez was the CEO of the Texas LLC, but Rodriguez individually was not an equity member.  Furthermore, the Texas LLC was not connected

---

[15]  Davison transferred his interest in MP-LC to his friend Mark White prior to execution of the Development Agreement due to Davison's own financial difficulties.  White did not bring any financial strength to MPDP, and he testified that he would not have been involved with Land Capital in an equity ownership capacity because he knew of Davison's financial troubles.  After the Development Agreement was signed in August 2009, White became a vice president and employee of MPDP, earning an annual salary of $275,000 from MPDP.

[16]  The RFP contemplated that any legal entity created to enter into the Development Agreement would be in existence prior to the RFP.  Davison created MPDP prior to submitting Land Capital's RFP response with only a shell corporation as its member, and Rodriguez's Texas LLC did not join the entity until over a year later.  Even then, MPDP clearly was not a joint venture or partnership with Brass/Magi as represented.

with Brass/Magi except to share Rodriguez as a common owner, and Brass/Magi was not a member of MPDP. Rodriguez denied being financially responsible for MPDP and denied having any joint venture partnership with Land Capital or MPDP.[17]

The record contains no evidence of a joint venture or partnership between Land Capital, Magi/Brass and MPDP. Davison testified that he had used the terms "joint venture" and "partner" only in the loose associational or general sense of the words, not in a legal sense. Similarly, although Galt made statements at CMPA meetings representing that Land Capital had "partnered" with Brass/Magi for the project, during his testimony at the evidentiary hearing, he emphasized that he had "partnered" with *Davison* for this project, and even then, only in a loose sense. Galt testified that he was aware of Land Capital's financial problems before entering into the RFP and because of those problems, he would not have entered into a joint venture with Land Capital. He also confirmed that neither Land Capital nor Davison were equity owners of the development entity, MPDP, again, because of Land Capital's financial problems.[18] There is no evidence that Davison or Galt disclosed Land Capital's financial problems to CMPA or explained their casual use of legal terms during the process. Based on the testimony, it is obvious to the Court that CMPA used and understood the terms joint venture and partner in their commonly accepted legal sense, and in any event, no disclosure was made to lead them to believe otherwise. Davison and Galt were sophisticated businessmen engaged in a

---

[17] Rodriguez also testified that MPDP was not a "shell" corporation because that implies it had no purpose. He testified that instead, it had intellectual capital and was a special purpose entity in contemplation of a transaction. The CCNA procedures, however, were designed to ensure the Development Agreement was awarded to a qualified "firm" comprised of qualified professionals with the expertise and financial capability to complete the project, not a special purpose entity with only intellectual capital and no legal connection to a qualified firm.

[18] In fact, in his deposition testimony, Galt went so far as to say that anyone who read the newspaper would have known of Land Capital's financial problems. On cross examination at the hearing, Galt also acknowledged that Land Capital's changed circumstances between the time of the RFQ representations and the time MPDP signed on as Master Developer was something he, as a business man, would have expected to be disclosed. Nonetheless, although he continued to represent himself to CMPA as a partner with Davison, he never disclosed the true facts about Land Capital to CMPA.

formal public procurement process, and both were fully aware of what was expected and what they were representing.

7.      Davison did not disclose that Land Capital was having *any* financial difficulties until directly questioned during a public meeting on December 12, 2008, after CMPA board members and the public had begun to hear rumors and news reports that some Land Capital projects had fallen into foreclosure.  CMPA Board member Betina Terry testified that previously, Davison had visited her office on many occasions and had personally assured her and told her not to worry about the rumors of Land Capital project foreclosures.[19]  He told her that the facts had been misrepresented in the media and that the project financing was sound.  By this time, although Davison testified that he was hopeful Land Capital would come through, Land Capital was unquestionably collapsing.  Davison's deposition testimony indicates that by December 2008, he had "considered" the possibility that Land Capital would be unable to be involved in the project going forward.[20]  When confronted about the foreclosure proceedings during a public meeting in December 2008, Davison acknowledged them but assured CMPA that Land Capital had remedied each situation and had changed to an out-sourcing business model, which, according to Davison, was a common measure taken by other companies as well.  Davison continued to assure CMPA that it was "business as usual" at Land Capital.  Furthermore, he assured CMPA that Land Capital's financial problems did not put the project at risk, explaining that the development entity, MPDP, was isolated from Land Capital's financial difficulties.  Davison again emphasized that Land Capital was "a joint venture" with Brass/Magi, who were the "equity partners" and "predominant owners of the project."  Davison told CMPA he had purposefully secured this "strong financial partner" because he knew the project

---

[19]  Davison testified that he relied heavily on his ability to develop strong personal relationships.  He boasted at a public meeting that "[t]he CMPA Board has come to know me very well."

[20]  Certainly Galt and Rodriguez knew this as well, as their testimony confirms they knew of Land Capital's financial difficulties from the beginning and for this reason, Land Capital was not involved in MPDP.

was too big for Land Capital alone.[21]  In reality, there was no joint venture partnership. Rodriguez disclaimed having any individual liability for MPDP, and, although he owns the Texas LLC that is the predominate owner of MPDP, the Texas LLC was created solely for this purpose with no assets and also is not connected to Brass/Magi.

8.      Davison testified that he disclosed Land Capital's demise by telephone to Abramson, the City's representative, while negotiating the contract in late February or March 2009.  According to Davison, an email from Abramson dated March 7, 2009, requesting Magi's financial statements for review is proof that he made this disclosure. The Court does not agree, and even assuming Davison made such a disclosure by telephone, this does not amount to a public disclosure to CMPA.

Abramson's deposition testimony, a portion of which was admitted at trial, neither confirmed nor denied Davison's purported disclosure.  Instead, Abramson testified that he recalled hearing of Davison's financial troubles from Beitsch, CMPA's representative, sometime between November 2008 and April 2009.  Abramson recalled that they discussed their understanding that Brass/Magi were the development partners providing the financial wherewithal for the development entity, as opposed to Davison and Land Capital, with Rodriguez as the "real money guy" in Brass/Magi.  This understanding is consistent with Davison's public representations.[22]  However, neither Abramson nor CMPA were aware that in reality, Rodriguez was not financially obligated in any way.  Abramson testified that based on the representation that Brass/Magi were the financial partners, he suggested having a qualified auditor look into this "member's" financial records.  This was

---

[21]  Judge Collier testified that he had contacted the second-ranked applicant, Trinity Capital Advisors, to make sure it was still on board in case the negotiations with Land Capital were unsuccessful.  He further testified that CMPA would not have proceeded with Land Capital had it known of Land Capital's lack of qualifications, but he said he was satisfied by Davison's explanations at the December 2008 meeting regarding CMPA's partnership with Brass/Magi and because of CMPA's subsequent review of Magi's financials.

[22]  Furthermore, the RFP had stated Brass/Magi was the financial partner and offered its financials for CMPA to review.  According to Judge Collier, CMPA had decided in December 2008 to reassess the financial strength of Magi based on Davison's assurances at the public meeting that Brass/Magi was the financially responsible partner.

done by Mort O'Sullivan, who reported during a CMPA Board meeting on March 13, 2009, that he had reviewed "the financial statements of the stronger of the partners, Magi Financial," and found them to be financially sound. Thus, Davison's assertion that Abramson requested Brass/Magi's financials in response to Davison's telephone "disclosure" is inconsistent with Abramson's testimony.

9. Instead of making a full public disclosure regarding Land Capital's demise and making sure that CMPA was well aware of the fact that Land Capital would no longer be involved in the project, the record shows that throughout the contract negotiations, Davison and Galt continued to lead CMPA to believe that MPDP was a joint venture partnership between Land Capital and Brass/Magi. Davison appeared at public meetings on December 1 and December 12, 2008, and again in January 2009, and continued to refer to a partnership. He also never corrected or clarified statements made at these meetings by Beitsch and Abramson that confirmed this relationship. Specifically, on December 1, 2008, during a public meeting before the CMPA Board, CMPA's representative Beitsch, who had been negotiating with Davison and Galt, explained that CMPA should refer to the Developer as MPDP, not Land Capital, because MPDP was the development entity created to carry out the project and it was important to correctly identify the party CMPA was dealing with. Beitsch further explained at this public meeting his understanding that the development entity was comprised of Brass/Magi and Land Capital, whom he described as the "active participants" in the development group. Davison was present at the meeting and addressed CMPA after Beitsch yet he did not offer any correction, or clarification, in spite of the fact that Land Capital was collapsing and there was no joint venture agreement. In fact, both Galt and Rodriguez now deny that a joint venture ever existed.

At the December 12, 2008, meeting discussed above, Davison continued to mislead CMPA by expressly assuring CMPA that Magi was "the financially strong" partner in the development entity. Also, at a public workshop on January 28, 2009, Abramson reported that the development entity consisted of Land Capital and Brass, and he dispelled public

concern by expressing confidence that Davison had a sense of the overall picture of this project and that Land Capital and Magi would bring in the necessary expertise to get the job accomplished,[23] and Davison sat by quietly. Galt spoke on behalf of MPDP at a January 2009 meeting, and again represented that he had "partnered" with Davison, and he touted the benefits of proceeding through MPDP, which would serve as the one responsible entity for the project, though Davison knew MPDP had no assets or financially responsible "members."

Again, in Abramson's email to Galt on March 7, 2009, he expressly referred to Magi as one of MPDP's "members," and neither Galt nor Davison corrected this false impression.[24] Instead, Davison and Galt gave CMPA a false sense of security by providing Magi's financials for CMPA's review while knowing that Magi was never a joint venture partner in MPDP in a legal sense, which was the only relationship that mattered to CMPA. Judge Collier and City Attorney Wells testified that CMPA considered Magi's financial statements to be more than adequate, satisfying their concern about Land Capital's financial difficulties. Thus, the record reflects that CMPA reasonably believed Brass/Magi were members of, or partners in, MPDP, based on Davison and Galt's representations.

10.     Galt testified that CMPA knew Land Capital was no longer involved at the time the Development Agreement was signed because Davison was asked to sign the Development Agreement only on behalf of MPDP, not Land Capital, and an express

---

[23] Abramson's statement that MPDP would bring in the requisite professionals merely illustrates his trust in Davison and does not contradict the requirement in the RFQ and RFP that the Developer have in-house professionals to manage the project, which is what CMPA expected all along. There is no reason Abramson would have known of the RFQ requirement as he was not involved at that time, and he had no authority to reassess the qualifications of the firm chosen by CMPA as most qualified. Judge Collier testified that the CMPA Board anticipated team members would be employees or formal partners of the firm chosen, and he confirmed that the City did not have the right to renegotiate the qualifications of an applicant outside of the formal qualifications process.

[24] Abramson asked for "MPDP members' (Magi's) financial statements." (Defendant's Ex. 22). Galt testified he provided Magi's financials only because CMPA requested them, maintaining he did not represent them as MPDP's financials, and Davison testified that MPDP was a new entity with no assets so there was no reason to submit MPDP's financials. Nonetheless, it is clear from the record that Galt and Davison intended CMPA to believe that MPDP and Brass/Magi were linked together as joint venture partners, which was not true.

provision in the Development Agreement stated, "As of the effective date of this Agreement, the Developer is Controlled by Richard J. Rodriguez."[25] However, by the time the Agreement was approved in April 2009, enough had been disclosed about Land Capital's financial difficulties that CMPA clearly looked to Rodriguez as the "partner" who would be providing the financial capacity for the team, based on Davison and Galt's misrepresentations, when in reality, neither Rodriguez nor Brass/Magi were legal members or joint venture partners in MPDP as CMPA contemplated and had been led to believe. It is clear from the evidence that CMPA was not fully aware of the true makeup of the development entity or the complete demise of Land Capital, the winning firm, until well after the Agreement was approved and signed.

11.    CMPA also required the Master Developer to be prepared and qualified through the CCNA process to assume the design-build contractor role at the time of entering into the Development Agreement, although CMPA retained discretion to separately award that portion of the contract. The Development Agreement provided for an additional 3% fee to the Master Developer if named the design-build contractor as well. This arrangement was intended to promote greater efficiencies and cost savings for the project. However, *after* execution of the Development Agreement and subsequent award of the design-build contract to MPDP, CMPA learned that MPDP was actually not financially positioned to step into the design-build construction general contractor role, as had been contemplated.

In January 2010, Mark White, a vice president of MPDP who took over as project manager after it was clear that Bruce Cutright would not fill that role, requested that MPDP be awarded the design-build contract. CMPA approved the request, but MPDP was unable

---

[25] Rodriguez actually controlled the Texas LLC, which was the controlling member of MPDP. The Texas LLC did not become a member of MPDP until July 2009, which was after the Development Agreement had been negotiated and approved but before it was formally executed. The problem was that neither Rodriguez nor Brass/Magi were financially responsible for any obligations of the Texas LLC or MPDP. To compound the problem, Davison was not listed as in control of the development entity or as a key person for any particular role to be performed by the Master Developer. CMPA maintains it was not aware of the true makeup of MPDP until it began its discovery in this case, which is supported by the record.

to secure the necessary bonding for the project and instead cobbled together a last-minute proposal to create an LLC with Hoar Construction to provide the requisite bonding capacity. CMPA ultimately approved an arrangement whereby MPDP and Hoar Construction formed a new company, Magi Construction, LLC, which was then named as the general contractor on the design-build contract. This was done in some haste because MPDP's inability to secure the requisite bonding placed CMPA in danger of losing nearly $12 million worth of new market tax credits for the project. The creation of Magi Construction LLC prevented the loss of these tax incentives and cured–for the moment–the problem of MPDP not having the bonding capacity as represented. Under this arrangement, Hoar Construction and MPDP agreed to share the Developer's 3% fee for the design-build contract.[26] It is significant that MPDP would not have had the opportunity to create this arrangement and share in the design-build fee had it not prevailed as Master Developer through the CCNA public procurement process.

12.    The parties stipulated that CMPA paid MPDP a total of $2,547,429.96[27] pursuant to the Development Agreement, consisting of $1,490,263.35 as reimbursable project costs;[28] $150,000 as reimbursement for attorney's fees and legal expenses; and $907,166.61 as the Developer's 4% Development Fee. The parties also stipulated that MPDP's share of the profits from the design-build contract is $560,785.96, consisting of

---

[26]   Hoar Construction is the controlling partner of Magi Construction LLC with a 51% interest and MPDP shares a 49% interest; Hoar and MPDP agreed to split the 3% Master Developer's fee for the design-build project according to these percentages. After the Court's summary judgment ruling, CMPA requested a preliminary injunction to preserve the status quo regarding profit owed to MPDP from Hoar Construction based on the design-build contract. The Court granted the motion, and MPDP appealed. This appeal is still pending, *see supra* Note 8.

[27]   In paragraph 3 of the parties' stipulated facts, the total is stated as $2,547,529.96, which the Court disregards as a misprint. The individual amounts listed correctly add up to $2,547,429.96, which is consistent with paragraph 2 of the stipulated facts and counsel's representation during closing arguments.

[28]   CMPA's attorney stated during closing argument that within this total of reimbursable costs is the sum of $70,922, which was paid to MPDP for lot clearing. The parties stipulated that MPDP paid $64,808 of that amount directly to a subcontractor.

$100,000, which was already paid, and an additional $460,786 that it is scheduled to receive, which is the subject of the Court's preliminary injunction.

**Conclusions of Law**

"A contract that contravenes an established interest of society can be found to be void as against public policy." *Chandris, S.A. v. Yanakakis*, 668 So. 2d 180, 185 (Fla. 1995); *see also Am. Cas. Co. v. Coastal Caisson Drill Co.*, 542 So. 2d 957, 958 (Fla. 1989). Also, public policy concerns are "heightened" when a public entity is involved in the contract. *See City of Hialeah Gardens v. John L. Adams & Co.*, 599 So. 2d 1322, 1324 (Fla. 3d DCA 1992), *rev. denied*, 613 So. 2d 5 (Fla. 1992). In Florida, competitive bid and qualifications-based competitive award statutes are designed to protect the public. *See Emerald Corr. Mgm't v. Bay Cnty. Bd. of Cnty. Cmm'rs*, 955 So. 2d 647, 652 (Fla. 1st DCA 2007); *City of Sweetwater v. Solo Constr. Corp.*, 823 So. 2d 798, 801 (Fla. 3d DCA 2002), *rev. denied*, 845 So. 2d 888 (Fla. 2003); see also *Coastal Caisson Drill Co.*, 542 So. 2d at 958 (stating Fla. Stat. § 255.05 is for the protection of the public). Florida courts have observed that the state's competitive award or competitive bid statutes confer "reciprocal benefits" on the participant and the public authority but also impose "reciprocal obligations" on each. *Emerald Corr. Mgm't*, 955 So. 2d at 652 (internal quotation marks omitted); *see also City of Sweetwater*, 823 So. 2d at 801. The aim of Florida's public policy in the competitive award context is "to eliminate improper influence, or the temptation to exert improper influence, in the obtaining of [CCNA] project funding awards and to eliminate arrangements which encourage the payment of inequitable fees bearing no reasonable relationship to the services actually performed." *City of Hialeah Gardens*, 599 So. 2d at 1325 (specifically discussing contingency fee arrangements, which are expressly prohibited in the CCNA).

Florida courts have long held that a municipality "may recover the full amount paid" on a contract that is void as expressly prohibited by law.[29]  *Town of Boca Raton v. Raulerson*, 146 So. 576, 577 (Fla. 1933); *see also Wester v. Belote*, 138 So. 721, 724 (1931) (recognizing that where an illegal or void contract already has been awarded and executed, and payments made by the public entity, the payments may be recovered back for the public treasury).  Additionally, "courts have an 'affirmative duty' to avoid allowing a party who violates public policy to receive any substantial benefits from his or her wrongdoing." *City of Hialeah Gardens*, 599 So. 2d at 1325 & n.3 (also noting that it is the court's duty to avoid "a raid on the public treasury" [30]); *see also Cooper v. Paris*, 413 So. 2d 772, 774 (Fla. 1st DCA 1982).  The Court concludes that in order to protect the public treasury, these principles must apply equally as a warning to participants in a public

---

[29]  The Florida Supreme Court explained in *Town of Boca Raton v. Raulerson*:

> This rule may, at a glance, seem a harsh one, because under it the town would be allowed to keep what it needs and uses and escape payment therefor, but the statute is upon the books for all to read and heed. It is a warning to those who become public officers that they may not take advantage of their position by dealing with themselves, and, being so warned, they enter upon such transactions at their peril. Should we apply in such instances the rule that recovery should be limited to the profit enjoyed from the transgression, it would open the way and extend the invitation to fraud as well as violation of the law.

*Town of Boca Raton v. Raulerson*, 146 So. 576, 577 (Fla. 1933).

[30]  This comment was made in the slightly different context of considering a contingency fee arrangement regarding a project within the scope of the CCNA.  *See City of Hialeah Gardens*, 599 So. 2d at 1323-24.  The CCNA requires professionals, namely, architects or engineers, to represent that they have not agreed to pay a contingency fee for the purpose of securing the award of a public contract within the scope of the CCNA and criminalizes the payment of such a fee, *see* Fla. Stat. § 287.055(6); as a result, the court in *City of Hialeah Gardens* concluded that such an agreement renders the contract void and unenforceable as against public policy.  In this case, although CMPA also alleged and provided some evidence that MPDP had offered to pay a contingency fee for the award of the Development Agreement (see doc. 18-5), there was no evidence that a contingency fee was ever actually paid.  Nonetheless, the Court finds that the context here–i.e., the failure to comply with the CCNA-required qualifications process coupled with findings in this Order showing false and misleading statements and intentional omissions were made during the CCNA qualifications process–is sufficiently analogous in nature to warrant applying the same general principles articulated in *City of Hialeah Gardens*.  Also, although the Florida Supreme Court subsequently has reversed a decision relying on *City of Hialeah Gardens*, *see Rotemi Realty, Inc. v. Act Realty Co.*, 911 So. 2d 1181, 1183 (Fla. 2005), the Court finds that decision, which involved a real estate brokerage arrangement, is factually distinguishable from the fraud context of this case and does not preclude reliance by this Court on the general principles stated in *City of Hialeah Gardens*.

procurement process who attempt to take advantage of the system by injecting material misrepresentations and omissions into the process to gain or retain a competitive advantage over other applicants competing in the public award process. As explained in *City of Hialeah Gardens*, citizens have a right to expect good faith and honest dealings with regard to expenditures of public money. *Id.* at 1325.

It is also firmly established in Florida law that where a competitive public contract was awarded in violation of a statute but "in apparent good faith, in an honest effort to pursue the requirements of competitive bidding statutes, and it is not shown that the contract *as actually entered into* is to the public's disadvantage in any way, nor that it has been entered into with unlawful or fraudulent intent," the decision of whether to restrain payments to the contracting party – or, presumably the converse, whether to require complete disgorgement payments received on the void contract – will rest with the court's discretion in light of the equities involved. *Wester*, 138 So. at 726. Relying on this principal, the Florida First District Court of Appeal permitted *quantum meruit* recovery of money spent in reliance on a public contract declared void due to a failure to meet statutory bidding requirements on grounds that, although the public official had required performance of the void contract, there was no indication of "fraud, corruption or unfair practices on the part of either party to the contract." *Robinson's Inc. v. Short*, 146 So. 2d 108, 114-18 (Fla. 1st DCA 1962), *cert. denied*, 152 So. 2d 170 & 155 So. 2d 548 (Fla. 1963). In *Robinson's*, the court reasoned that the contract at issue in the case, which "was considered void for direct evasion of an express mandatory [statutory bidding] provision," had been awarded for an honest bid, despite the statutory noncompliance. *Id.* (noting the bid had disclosed that a major portion of the contracted printing would be performed out of state, contrary to the statutory requirements). The court further stressed that the public had benefitted from performance of the contract because the services provided were necessary and there was no taint of fraud; thus, equitable *quantum meruit* recovery was not precluded. *See id.* After distinguishing other contexts where the law precluded any payment of public funds on a void contract (such as where there was no effort to comply

with the statutes or a theory of implied contract), the *Robinson* court further explained that if some equitable recovery is appropriate, it is limited to actual cost of goods and services provided for the public's benefit, not to exceed their reasonable fair value, and may not include any element of profit. *Id.* at 116-17. In sum, where a contract has already been awarded and performance has been rendered, *quantum meruit*, or presumably a right of setoff, regarding the public money will lie in equity upon proof of the following: (1) good faith in the competitive award process by all parties; (2) the services and supplies provided were necessary and beneficial to the public entity, no effort was made to restrain the performance, and performance was essential to prevent loss to the public; and (3) the cost did not exceed reasonable fair value for the goods and services provided. *Id.* at 118.

In this case, MPDP has asserted it acted in good faith in the CCNA process, that it performed and provided development services pursuant to the contract for over a year, which benefitted the public, and that the cost of those services did not exceed their fair value. CMPA disagrees, arguing that despite its own good faith attempt to comply with the competitive award statutes, the statutory noncompliance, which was the award of the Development Agreement to an unqualified firm, resulted because of fraud and misrepresentations on the part of MPDP's principals, foreclosing any equitable setoff and requiring MPDP to repay all public money received pursuant to the contract. Having carefully reviewed all of the evidence, the Court finds, for reasons stated in the findings of facts listed above and below, that material misrepresentations and omissions invaded the competitive award process, precluding MPDP from benefitting from a defense of setoff based on any services it may have provided as Master Developer and requiring MPDP to disgorge the Development Fee.

Having been chosen to negotiate in this statutory public procurement process based on qualifications, Land Capital and MPDP through their officers, Davison and Galt, had a *continuing* duty to disclose material information or withdraw if material qualifications were no longer met. *See generally Loc. No. 234 v. Henley & Beckwith, Inc.,* 66 So. 2d 818, 823 (Fla. 1953) ("[O]ne who has entered into a contract or undertaking which is violative of

public policy owes to the public the continuing duty of withdrawing from such an agreement."). The record before the Court demonstrates that instead of complying with this duty, Davison and Galt repeatedly to misled CMPA by failing to fully disclose material facts about Land Capital and MPDP for the purposes of qualifying for and maintaining a competitive advantage in the public procurement process. "Florida law recognizes that fraud can occur by omission and places a duty on one who undertakes to disclose material information to disclose that information fully." *ZC Ins. Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. 4th DCA 2003), *rev. denied*, 860 So. 2d 980 (Fla. 2003); *see also Gutter v. Wunker*, 631 So. 2d 1117, 1118-19 (Fla. 4th DCA 1994) ("[W]here a party in an arm's length transaction undertakes to disclose information, all material facts must be [fully] disclosed."). Galt and Davison were sophisticated businessmen on whom the importance and formality of a public procurement process would not have been lost.

Beginning with the RFQ process, Davison created false impressions that he had an impressive and professional "assembled" team, knowing there were no binding legal relationships among the members as contemplated by the RFQ. In fact, the team completely changed between the RFQ and RFP submissions, and Davison acknowledged in his testimony that he did not disclose expressly, either verbally or in writing, that the initial team members were no longer involved, although it was clear CMPA believed otherwise. This "assembled team" had helped Land Capital secure the number one ranking during the initial stage of the CCNA process. The RFP also required a fully assembled team, and Davison again represented that he had one when in fact he did not and instead merely hoped that he had one. He also misled CMPA to believe that Cutright was a team member and would be a key figure, when in fact Cutright had not been secured contractually as an employee or through any legally binding consultant agreement.

Moreover, Davison and Galt both made repeated assertions in the RFP proposal, during the RFP oral presentation to CMPA, and during public meetings throughout the contract negotiations that there was an existing "partnership" or "joint venture" relationship between Land Capital and Brass/Magi through MPDP, despite the absence of one. "A joint

venture is a legal relationship, similar to a partnership but more limited in scope." *Jackson-Shaw Co. v. Jacksonville Aviation Auth*., 8 So. 3d 1076, 1089 (Fla. 2008). Joint ventures are created for the purpose of a particular business deal or transaction and must arise out of a contract which includes: "(1) a community of interest in the performance of the common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits and (5) a duty to share in any losses which may be sustained." *Id*. (internal marks omitted). Although MPDP was created out of a community interest in a common purpose, Land Capital and Brass/Magi had no joint control of MPDP, no right to share in the profits of MPDP, and no obligation to share in any losses sustained by MPDP, as is required of a joint venture member. *See Jackson-Shaw Co.*, 8 So. 3d at 1089. Neither MPDP nor its true legal members (the LLCs created to be MPDP's members) had any assets nor were they connected to Land Capital or Brass/Magi as Davison repeatedly assured CMPA. The record confirms that Davison and Galt continued to lead CMPA to believe that Brass/Magi was Land Capital's financial "partner," joint venture member, or at least was affiliated with MPDP's LLC legal members, despite the fact that Richardson would not allow his companies to be an equity partner with Land Capital. In fact, Richardson denied the existence of any joint venture relationship between his companies (Brass/Magi) and Land Capital or MPDP. The Court rejects Davison's and Galt's assertions that they used the terms "joint venture" and "partnership" only in a loose sense with no intent to mislead. Their repeated use of these terms throughout the formal public procurement process for the purpose of securing the Master Developer Agreement over other competitors demonstrates an intent to deceive.

Davison also falsely represented that Land Capital would be the "lead developer" when, as noted, he knew it was financially collapsing. It is clear from the record that Land Capital was failing even as Davison and Galt presented the RFP proposal. Its financial difficulties were the reason that Galt and Rodriguez became involved in the project (Davison needed a financial backer), and also the reason that neither Galt nor Rodriguez was willing to enter into a legal joint venture with Davison or Land Capital. Galt testified

that he knew of Davison's and Land Capital's financial troubles before the RFP was submitted.  Obviously, Davison was fully aware of it as well.  Davison, Galt and Rodriguez all testified that the circumstances had changed between the time the RFP proposal was submitted and the Development Agreement was approved and executed, and they insist they did their best to work through a difficult situation when Land Capital began to fail. However, the Development Agreement was not approved or executed until well after Land Capital's demise was obvious to them, and the parties did not disclose either its collapse or the lack of any legally binding joint venture agreement between Land Capital and Brass/Magi or MPDP's members.  Based on Davison's and Galt's assurances, CMPA was misled to believe it was negotiating with the most highly qualified firm under the CCNA and that Land Capital had in place the team and joint venture arrangement promised, in addition to the financial commitment of Brass/Magi.  Despite a continuing obligation to fully disclose the legal relationships and true state of affairs of Land Capital and MPDP, and many opportunities to do so, no such disclosure was ever made.  As a consequence, Davison and Galt wrongfully gained a competitive advantage for Land Capital and MPDP over Trinity Capital Advisors, the next most qualified firm.

The Court rejects as contrary to the evidence Davison's assertion that he acted out of optimism that Land Capital would survive, as opposed to bad faith.  The Court also disagrees with MPDP's assertion that Land Capital's demise was fully disclosed by Davison's public acknowledgment of some of Land Capital's financial troubles as well as the wording of the Development Agreement.  As noted above, Davison's public statements misled CMPA to believe Land Capital would pull through and that MPDP was controlled by Rodriguez and the financially strong partner, Brass/Magi.  Regarding the Development Agreement, although it was signed by MPDP, not Land Capital, and included a provision naming Rodriguez as the person in control of the development entity, neither the true legal members of MPDP nor its true "shell" status were disclosed.  In the face of Davison's and Galt's repeated public assurances that Brass/Magi was the financially responsible joint venture partner of Land Capital and MPDP, neither the general awareness of Land Capital's

financial troubles nor the wording of the Development Agreement can be considered adequate disclosure of MPDP's true members or the true state of affairs.[31]

Based on Davison's and Galt's material misrepresentations and omissions on behalf of Land Capital and MPDP in this public procurement process, the Court concludes that the circumstances of this case do not fall within the narrow good faith exception established in *Robinson's*, and thus there is no need to consider the remaining factors set forth in *Robinson's*, such as fair market value for services provided by the Master Developer.[32] Consequently, the entire amount paid to MPDP as the Master Developer's Development Fee of $907,166.61 must be disgorged, regardless of any services actually provided by MPDP as Master Developer. The Court has "an affirmative duty to see that the party violating public policy not benefit in any way as a result of his wrongdoing." *Cooper*, 413 So. 2d at 774. Also, consistent with the Court's Preliminary Injunction Order, MPDP must disgorge the profit from the design-build contract, which totals $560,785.96 ($100,000 that MPDP already received plus $460,786).[33] Although the validity of that contract is not at issue in this case and is not challenged, MPDP's profit from the design-build contract flowed directly from the rights it wrongfully obtained as Master Developer under the Development Agreement and through the CCNA process. Thus, this profit must be disgorged as well.

CMPA also would have the Court require MPDP to repay amounts that passed through MPDP as reimbursable costs paid directly to project professionals and

---

[31] Even if the Court accepts Davison's testimony that he made a private "disclosure" of Land Capital's demise to Abramson in late February 2009, this informal telephone conversation with Abramson, who was not a CMPA Board member, was too little too late to constitute full disclosure.

[32] The Court finds it puzzling that MPDP argues in its trial brief that it should not have been required to litigate fair market value without notice in the pleadings that any harm had occurred, when in fact, the Court's use of the *Robinson's* analytical framework was to MPDP's benefit. If there had been no fraud, MPDP might have been permitted to retain that portion of the Development Fee that was the fair market value of the services it provided as a setoff. In light of the material misrepresentations and omissions, however, there is no need to consider whether MPDP provided any valuable developer services.

[33] To the extent payment amounts discussed in the Preliminary Injunction Order or in other previous orders are inconsistent with this Order, this Order controls. At the time of all prior orders, the evidentiary hearing had not yet been conducted, and the parties stipulated to the amounts stated in this Order in their pretrial statement.

subcontractors, totaling $1,490,263.35, and amounts reimbursed for legal fees, totaling $150,000. With one exception, there is no dispute that the project reimbursable costs totaling $1,490,263.35 were paid directly to the project professionals and subcontractors for services they provided. The one exception is that CMPA reimbursed MPDP $70,922 for lot clearing but MPDP only paid the contractor $64,808, leaving a difference of $6,114, which MPDP apparently retained. This benefit to MPDP must be disgorged. Similarly, the $150,000 legal fees were reimbursed for MPDP's benefit and must also be disgorged. In all other respects, however, the record shows that MPDP acted as a mere payment agent for CMPA with regard to the reimbursable costs. There is no dispute that qualified professionals and subcontractors, not MPDP, provided these valuable services and that MPDP remitted the reimbursement directly to them.[34] In fact, for over a year, CMPA approved the invoices as reasonable payment for services provided by the professionals and subcontractors, and the public benefitted from the work.[35] Requiring repayment of these amounts from MPDP would be more in the nature of damages and a windfall to the public, as opposed to equitable disgorgement.

---

[34] The reimbursable costs were paid based on receipts from the professionals after CMPA reviewed them without objection to the cost of the work or materials provided. CMPA did not plead that it was harmed by the work or materials provided by the project professionals or subcontractors.

[35] The park is now constructed, so CMPA will not have to restart the public procurement process with a qualified Master Developer. Although the Court previously concluded that MPDP is not entitled to the benefit of an equitable setoff under the *Robinson's* analysis, these reimbursable costs fall outside the scope of that analysis because the record clearly indicates that these costs were not incurred by the Developer. The Court is not here applying a setoff but simply concluding as a matter of equity that MPDP did not derive any "benefit" from these payments. The Florida cases suggesting that a municipality may recover all money paid on a contract that is void for violation of competitive bid statutes used discretionary language, i.e., "may," and did not involve the type of developer agreement at issue in this case. Those cases involved contracts for a particular material or service that was provided by the contractor whereas here, as stated above, the project reimbursable costs were not compensation paid to MPDP for any materials or services that MPDP provided. However, this is not to say that CMPA still owes MPDP on any outstanding invoices for costs. The Development Agreement is void, and MPDP can claim no rights under a void contract. *See Harris v. Sch. Bd. of Duval Cnty.*, 921 So. 2d 725, 735 (Fla. 1st DCA 2006) ("'A contract entered into in violation of statutes and rules requiring competitive bids is absolutely void . . . and no rights can be acquired thereunder by the contracting party." (quoting *Wester*, 138 So. at 724)). The Court concludes only that equitable disgorgement of these amounts from MPDP is not appropriate.

Accordingly:

1.     Defendant Maritime Park Development Partners, LLC, is ordered to disgorge to Plaintiff Community Maritime Park Associates, Inc., the total sum of $1,624,066.57.[36]

2.     The Clerk is directed to enter judgment accordingly in favor of Plaintiff and against the Defendant and tax costs against the Defendant.

**DONE and ORDERED** this 4th day of February, 2014.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[36]  The total judgment represents amounts CMPA paid on the void Development Agreement as the Development Fee ($907,166.61), the reimbursement of MPDP's attorney's fees ($150,000), MPDP's profit on the lot clearing ($6,114), and MPDP's profit from the design-build contract ($560,785.96).

Case No. 3:11cv60/MCR/CJK